WINFIELD KILLAM, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 89151–89156. Filed January 16, 1963.

---

[1] Proceedings of the following petitioners have been consolidated herewith for purposes of trial, briefs, and opinion: Winfield Killam and Estate of Vernelle Killam, Deceased, Winfield Killam, Community Survivor and Sole Heir, Docket No. 89152; Radcliffe Killam and Sue Spivey Killam, Docket No. 89153; John G. Hurd and Estate of Patricia K. Hurd, Deceased, Radcliffe Killam, Independent Executor, Docket No. 89154; John G. Hurd, Docket No. 89155; and Estate of Patricia K. Hurd, Deceased, Radcliffe Killam, Independent Executor, Docket No. 89156.

*Weldon J. Squyres, Esq.,* and *Arthur Squyres, CPA,* for the petitioners.

*John J. King, Esq.,* and *Robert L. Liken, Esq.,* for the respondent.

OPINION.

ARUNDELL, *Judge:* Respondent determined deficiencies in income tax against petitioners for the calendar years and in the amounts as follows:

| Petitioner | Docket No. | Year | Deficiency |
|---|---|---|---|
| Winfield Killam | 89151 | 1954 | $5,667.65 |
| Winfield Killam and Estate of Vernelle Killam, deceased, Winfield Killam, community survivor and sole heir | 89152 | 1955 | 6,565.39 |
| Radcliffe Killam and Sue Spivey Killam | 89153 | 1954 | 4,824.77 |
| Do | 89153 | 1955 | 5,691.37 |
| Do | 89153 | 1956 | 2,885.89 |
| John G. Hurd and Estate of Patricia K. Hurd, deceased, Radcliffe Killam, independent executor | 89154 | 1954 | 4,333.99 |
| Do | 89154 | 1955 | 6,660.97 |
| John G. Hurd | 89155 | 1956 | 622.13 |
| Estate of Patricia K. Hurd, deceased, Radcliffe Killam, independent executor | 89156 | [1] 1955 | 6,774.78 |

[1] For the period Jan. 2, 1955, to Dec. 31, 1955.

Numerous errors have been assigned but we understand from the stipulation of facts that only one issue need be decided by us, namely, whether Killam & Hurd, a partnership, continued to possess three separate interests in the Quien Sabe Field consisting of its interests in the Bruni 77 Lease, the Bruni 128 Lease, and the Blanco-McLean Lease, after entering into a unitization agreement whereby these properties were unitized into the Quien Sabe Unit; and, regardless of whether this issue is decided for or against petitioners, we understand the remaining issues will be disposed of in the computations to be made under Rule 50.

The facts were stipulated and are so found.

Petitioner Winfield Killam is an individual residing in Laredo, Tex. He filed an individual return for 1954 with the district director of internal revenue for the First District of Texas at Austin. For the year 1955 he and his wife Vernelle filed a joint return at the same place. Vernelle died August 18, 1959, and the petition was filed in the name of Winfield and the estate of his deceased wife.

Petitioners Radcliffe Killam and Sue Spivey Killam are husband and wife residing in Laredo, Tex. They filed joint returns for the years 1954, 1955, and 1956 with the district director of internal revenue for the First District of Texas at Austin.

John G. Hurd and Patricia K. Hurd were, during 1954, husband and wife residing at Laredo, Tex. Patricia died January 2, 1955. In-

dividual income tax returns were filed in the names of John G. Hurd and Patricia K. Hurd, deceased, for the years 1954 and 1955, in the name of estate of Patricia K. Hurd for the period January 2 to December 31, 1955, in the name of John G. Hurd for the year 1956, and in the name of estate of Patricia K. Hurd for the year 1956. All returns were filed with the district director of internal revenue for the First District of Texas at Austin.

During the year 1954, Killam & Hurd was a partnership composed of Winfield Killam, Radcliffe Killam, and John G. Hurd, in which partnership each partner had an equal one-third interest.

After the death of Patricia K. Hurd on January 2, 1955, her one-half community interest in the partnership interest of her husband, John G. Hurd, in Killam & Hurd was thereafter owned by the estate of Patricia K. Hurd.

On January 10, 1955, but effective as of January 1, 1955, Winfield Killam withdrew from the partnership of Killam & Hurd receiving cash, oil payments, and nonproducing leases.

During the years 1955 and 1956, Killam & Hurd was a partnership composed of Radcliffe Killam, John G. Hurd, and the estate of Patricia K. Hurd, in which Radcliffe Killam had a one-half interest, John G. Hurd had a one-fourth interest, and the estate of Patricia K. Hurd had a one-fourth interest.

On July 1, 1952, Killam & Hurd acquired a producing oil, gas, and mineral lease located in the Quien Sabe Field in Webb County, Tex., known as the Bruni 77 Lease. Killam & Hurd had an original cost in the Bruni 77 Lease of $52,827.72, and in the equipment thereon of $52,827.73.

On March 1, 1954, Killam & Hurd acquired interests in two additional producing oil, gas, and mineral leases located in the Quien Sabe Field known as the Bruni 128 Lease and the Blanco-McLean Lease. Killam & Hurd had a cost basis in the Bruni 128 Lease of $31,502 and in the equipment thereon of $9,450.93, and in the Blanco-McLean Lease of $150,000 and in the equipment thereon of $25,896.96.

On April 1, 1954, the leasehold cost of Killam & Hurd of the Bruni 77 Lease had been fully depleted, while Killam & Hurd's cost basis in the Bruni 128 and Blanco-McLean Leases had not been recovered.

On March 10, 1954, Killam & Hurd entered into a voluntary unitization agreement with other lease owners in the Quien Sabe Field forming the Quien Sabe Unit (hereinafter referred to as the unit). The unit was made up of the Bruni 77, Bruni 128, and the Blanco-McLean Leases. The unitization agreement became effective on April 1, 1954.

Pertinent provisions of the unitization agreement are set forth below:

Know all men by these presents that:

## I.

WHEREAS, Frost National Bank, Substitute Trustee for McLean Trust, Blanco Oil Company, Estate of A. A. Buchanan, Deceased, and Killam & Hurd, a general partnership * * *, are the joint owners and holders of the [Blanco-McLean Lease] * * * and

WHEREAS, the oil, gas and other minerals that may be produced, saved and sold from the said lands under and by virtue of the said oil, gas and mineral lease are owned by the following owners in the respective proportions indicated, to-wit:

|  | Decimal factor |
|---|---|
| Name and fractional interest: | |
| Frost National Bank, Substitute Trustee for McLean Trust ($13/32$ W.I.) | 0.40625 |
| Blanco Oil Company ($39/256$ W.I.) | .15234375 |
| Estate of A. A. Buchanan, Deceased ($13/256$ W.I.) | .05078125 |
| Killam & Hurd ($13/64$ W.I.) | .203125 |

| * | * | * | * | * | * | * |

[Then follows the listing of 17 separate owners of "royalty interests" having a total decimal factor of 0.1875 which, added to the four separate owners of "Working Interests" having a total decimal factor of 0.8125, make up the 100% ownership of the Blanco-McLean Lease.]

and

## II.

WHEREAS, Killam & Hurd is the owner and holder of the [Bruni 128 Lease] * * * in the capacities indicated * * * and

WHEREAS, the oil, gas and other minerals that may be produced, saved and sold from the said lands under and by virtue of the said oil, gas and mineral lease are owned by the following owners in the respective proportions indicated, to-wit:

|  | Decimal factor |
|---|---|
| Name and fractional interest: | |
| Killam & Hurd (7/8 W.I.) | .875 |
| Commissioner of the General Land Office of the State of Texas (1/16 R.I.) | .0625 |
| O. W. Killam (1/32 R.I.) | .03125 |
| Bruni Estate (1/32 R.I.) | .03125 |

and

## III.

WHEREAS, Killam & Hurd is the owner and holder of the [Bruni 77 Lease] * * * in the capacities indicated * * * and

WHEREAS, the oil, gas and other minerals that may be produced, saved and sold from the said lands under and by virtue of the said oil, gas and mineral lease are owned by the following owners in the respective proportions indicated, to-wit:

| Name and fractional interest: | Decimal factor |
|---|---|
| Killam & Hurd (7/8 W.I.) | .875 |
| O. W. Killam (1/16 R.I.) | .0625 |
| Bruni Estate (1/16 R.I.) | .0625 |

and

\*　　\*　　\*　　♦　　\*　　\*　　\*

## VI.

WHEREAS, the Lessees and the Lessors desire to unitize, pool and combine the said oil, gas and mineral leases as to all of the lands covered thereby so that to the extent, and only to the extent, as herein provided the "unitized area" may be developed and operated as one lease for the production of oil, gas and other minerals from the Quien Sabe sand, it being the conviction of the Lessees and the Lessors that such a unitization of operations under the said oil, gas and mineral leases will promote the conservation of oil, gas and other minerals and will enable the ultimate recovery of a greater amount thereof;

\*　　\*　　\*　　\*　　\*　　\*　　\*

and

## VIII.

WHEREAS, the Lessees and the Lessors have agreed upon a unitization of the said oil, gas and mineral leases as to the Quien Sabe sand reservoir on the basis of present oil in place and calculated future recoverable oil and have agreed upon the following participating factor to be assigned to the foregoing oil, gas and mineral leases, respectively:

| | |
|---|---|
| (1) That in Paragraph I | 0.514868 |
| (2) That in Paragraph II | .007262 |
| (3) That in Paragraph III | .477870 |
| Total | 1.000000: |

NOW, THEREFORE, for and in consideration of the premises, of the mutual benefits to be obtained and of the covenants and agreements herein contained, it is agreed by and between [names of all the owners of "royalty interests"] * * * herein, in the aggregate, called "Lessors", they being the present owners and holders of all of the aggregate benefits of the original lessors in the said oil, gas and mineral leases; Frost National Bank, Substitute Trustee for McLean Trust; Blanco Oil Company, a Texas corporation; Estate of A. A. Buchanan, Deceased; and Killam & Hurd, a general partnership * * * herein, in the aggregate, called "Lessees", as follows:

## IX.

This unitization agreement is hereby expressly limited to the unitization or pooling of oil, gas and other minerals and the rights therein only in the Quien Sabe sand as it is hereinafter defined.

\*　　\*　　\*　　\*　　\*　　\*　　\*

## X.

The Lessors and the Lessees agree that the hereinabove described oil, gas and mineral leases as to all of the lands covered thereby are hereby unitized for developmental and operational purposes as to oil, gas and other minerals in the Quien Sabe sand * * *

\*　　\*　　\*　　\*　　\*　　♦　　\*

## XI.

Upon the termination of the unitization hereby effected, the then property rights of each of the parties hereto shall be as though this unitization had never become effective. * * *

## XII.

Any provision of any of the said oil, gas and mineral leases to the contrary notwithstanding and in lieu of the royalties therein provided, each of the parties hereto covenants, agrees and stipulates that the following is and shall be the apportionment of all of the oil, gas and other minerals produced, saved and sold from the Quien Sabe sand in the unitized area so long as this unitization agreement shall remain in effect:

### WORKING INTERESTS

| | |
|---|---|
| Frost National Bank, Substitute Trustee for McLean Trust | .209165125 |
| Blanco Oil Company | .078436921875 |
| Estate of A. A. Buchanan, Deceased | .026145640625 |
| Killam & Hurd | .5290730625 |
| | [.84282075] |

### ROYALTY INTERESTS

[Then follows the separate listing of all the owners of "royalty interests" having a total apportionment of 0.15717925 which, added to the four separate owners of "working interests" having a total apportionment of 0.84282075, make up the 100% ownership of the apportionment.]

\*     \*     \*     \*     \*     \*     \*

The parties to the unitization agreement who held working interests in the three leases entered into an "operating agreement" with respect to the unit on April 1, 1954. In this operating agreement, Killam & Hurd was designated as the operator of the unit.

Prior to the effective date of the unitization agreement, Killam & Hurd received the following amounts of the oil, gas, and minerals produced from the leases making up the Quien Sabe Unit:

| Lease | Total working interest | Killam & Hurd working interest |
|---|---|---|
| Bruni 77 Lease | 0.875 | 0.875 |
| Bruni 128 Lease | .875 | .875 |
| Blanco-McLean Lease | .8125 | .203125 |

Under the unitization agreement effective on April 1, 1954, the leases placed in the Quien Sabe Unit were assigned the following participating factors:

| Lease: | Participating factor |
|---|---|
| Bruni 77 Lease | 0.477870 |
| Bruni 128 Lease | .077262 |
| Blanco-McLean Lease | .514868 |
| Total | 1.000000 |

Under the Quien Sabe unitization agreement, Killam & Hurd received 0.5290730625 of the oil, gas, and minerals produced from the Quien Sabe sand in the unitized area, which was computed by multiplying the Killam & Hurd interest in each lease by the participating factor for that lease and totaling the results as follows:

| Lease | Killam & Hurd interest | Participating factor | Killam & Hurd income factor |
|---|---|---|---|
| Bruni 77 Lease | 0.875 | 0.477870 | 0.4181362500 |
| Bruni 128 Lease | .875 | .007262 | .0063542500 |
| Blanco-McLean Lease | .203125 | .514868 | .1045825625 |
| Total | | | .5290730625 |

The ratio percentage which the Killam & Hurd income factor for each of its lease interests in the Unit bore to the total of its lease interests in the unit is computed as follows:

| Lease in which Killam & Hurd had interest | Computation | Ratio percent of Killam & Hurd income factor in each of its lease interests in the unit to the total of Killam & Hurd lease interests in the unit |
|---|---|---|
| Bruni 77 | $\dfrac{0.4181362500}{.5290730625}$ = | 0.7903185394 |
| Bruni 128 | $\dfrac{.0063542500}{.5290730625}$ = | .0120101560 |
| Blanco-McLean | $\dfrac{.1045825625}{.5290730625}$ = | .1976713046 |

After the date of the unitization agreement, Killam & Hurd continued to compute depletion separately on each of the three lease interests which it placed in the unit.

Respondent determined that as a result of operations under the unitization agreement whereby the partnership of Killam & Hurd put its interest in Bruni 77, Bruni 128, and Blanco-McLean Leases into the unit, depletion was not allowable with respect to the individual leases but upon the income received by Killam & Hurd from its participating interest in the operations of the unit. Since percentage depletion based upon Killam & Hurd's income from the unit exceeded depletion based upon cost, percentage depletion was allowed by respondent to Killam & Hurd as follows:

Year:
1954 _____ $99,594.63
1955 _____ 75,519.08
1956 _____ 86,948.18

The parties agree that if petitioners' contentions are sustained, the depletion allowable to Killam & Hurd would be as follows:

| Leases | 1954 | 1955 | 1956 |
|---|---|---|---|
| Bruni 77 | $83,194.42 | $59,684.13 | $68,716.76 |
| Bruni 128 | 6,487.86 | 2,502.33 | 2,823.44 |
| Blanco-McLean | 21,027.05 | 16,812.96 | 18,493.71 |
| Totals | 110,709.33 | 78,499.42 | 90,033.91 |

In the event that it shall be determined by this Court that depletion must be computed in accordance with the respondent's determination as set forth in his statutory notices of deficiency issued in these proceedings, petitioners concede that the respondent's computation of depletion set forth in the second preceding paragraph of this report is in accordance with this Court's determination.

Petitioners contend that after unitization Killam & Hurd still had three separate property interests for depletion purposes, just as it had before the unit was formed, thus entitling the partnership to take percentage depletion on the Bruni 77 Lease and cost depletion on the other two.

Respondent contends that the effect of the unitization and operating agreements was to create a new or different economic interest in the oil in place which was different from the economic interests which Killam & Hurd had in the three leases prior to their contribution to the Unit and that, therefore, the partnership is entitled to take depletion of its unitized interest only on the percentage basis or only on the cost basis, depending upon which basis afforded the larger deduction. In the statement attached to the deficiency notice in Docket No. 89151, the respondent explained his position in this manner:

It is determined that as a result of operations under the unitization agreement whereby the partnership of Killam and Hurd put its Bruni 77, Bruni 128 and Blanco-McLean leases into the Quien Sabe Unit, depletion is not allowable in respect of individual leases, but upon the income received by the partnership from its participating interest in the operations of the Quien Sabe Unit. Since percentage depletion based upon its income from that source exceeds depletion based upon cost, percentage depletion has been allowed to the partnership as shown.

The parties agree that if, after unitization, the partnership still had three separate property interests for depletion purposes, the partnership would be entitled to take depletion on the Bruni 77 Lease on the percentage basis and to take depletion on the other two leases on the cost basis, and that this would amount to a larger depletion deduction than determined by the respondent. We understand from the stipulation that regardless of how the present issue is decided, the parties agree on the amount of depletion then allowable for, in petitioners' brief, it is stated "Contingent upon the determination of

this Court, the computations to be made under either petitioners' theory or respondent's theory have been agreed and stipulated."

The issue to be decided here is identical with the issue involved in *Belridge Oil Co.*, 27 T.C. 1044, affd. 267 F. 2d 291 (C.A. 9, 1959), with the exception that the situs of the property in *Belridge* was in California whereas the properties here involved are located in Texas. In holding for the taxpayer in *Belridge*, we said:

We think the net effect of what the participants to the agreement accomplished was the creation and organization of a consolidated production operation for the extraction of their respective shares of oil from the whole pool in which they held separate operating rights. * * * We think the unitization agreement here was nothing more than another joint effort on the part of the owners of the producing rights to the Zone to best conserve their respective individual interests therein by joining in a plan for the most economical and productive operation of the whole field. *Hence, we think each participant had exactly the same interests and rights in its respective properties after unitization as before, except that by mutual consent they had agreed to limit their production and operate their wells in the most economically feasible way from the standpoint of conservation considerations.*

The statute specifically gives a taxpayer, who owns a depletable economic interest in oil, which all concede the petitioner here had, an election to deplete its interest on the basis of the statutory percentage amount provided in section 114(b)(3), or by recovering its cost basis, *whichever is greater.* It seems to us that the respondent's determination here would deprive petitioner of the just due given it by the express terms of the statute. [Emphasis supplied.]

Before *Belridge* was affirmed by the Ninth Circuit we decided *Earl V. Whitwell*, 28 T.C. 372, reversed on other grounds 257 F. 2d 548 (C.A. 5, 1958). The unitization agreement in *Whitwell* was by compulsory action under a State law whereas the agreement in the *Belridge* case was voluntary. We said this was immaterial on the question of whether property or property rights were conveyed and that in either instance unitization amounts to no more than a production and marketing arrangement as between owners of oil-producing properties or rights.

The Fifth Circuit decided *Whitwell* before the Ninth Circuit decided *Belridge*. The properties involved in *Whitwell* were located in Louisiana. The Fifth Circuit affirmed our holding that unitization did not result in an exchange or cross conveyance of properties in that case giving as its reason that such holding was in line with the holding of the Supreme Court of Louisiana.[2]

Almost a year after the Fifth Circuit decided *Whitwell* the Ninth Circuit affirmed our decision in *Belridge Oil Co., supra.* In the course of its opinion, the Ninth Circuit said:

In his office and before the Tax Court, the commissioner took the position that the unitization bargain accomplished a tax free exchange of two separate

---

[2] *Shell Petroleum Corp.* v. *Calcasieu Real Estate & Oil Co.*, 185 La. 751, 170 So. 785; *Arkansas Louisiana Gas Co.* v. *Southwest Natural Production Co.*, 221 La. 608, 60 So. 2d 9.

property interests for a new property interest, and that two rules for depletion could not be apportioned within one new single property interest of Belridge. Of course, if such an exchange did occur there would be no doubt the commissioner's conclusion was and is correct.

The Tax Court sustained Belridge, the taxpayer. * * * In the minor readjustment of the figures, there is no issue. There just remains the big one: Can the taxpayer after this particular unitization cling still to its cost depletion for Result on oil he allots (based on percentages of experience on 64 zone before unitization) to Result.

*       *       *       *       *       *       *

One of the first questions here is whether there was any "exchange", of property *as known to the income tax law.* * * *

*This court is of the opinion that in income tax language there was no exchange.* * * * *Essentially the view we take of the unitization transaction is that it amounts to no more than an agreement as to how the parties will use that which they already had.* * * *

The case is somewhat different, but we regard our decision herein as in accord with *Whitwell* v. *Commissioner of Internal Revenue*, 5 Cir., 257 F. 2d 548, 551. [Emphasis supplied.]

We believe that, on the basis of our decisions in the *Belridge* and *Whitwell* cases, both of which have been affirmed as to this issue, our holding here should be for the petitioners. We realize, of course, that the laws of the various States are not uniform in determining the legal effect of unitizing oil properties. The Fifth Circuit recognized this point and discussed it at length in its decision in the *Whitwell* case. In that case the Fifth Circuit pointed out that the Texas and California courts and the Court of Appeals for the Fifth Circuit (in Texas cases) have adopted the theory that a unitization will effect an exchange. It also pointed out that in Oklahoma and Louisiana the courts have refused to follow the exchange theory and instead have held that the ownership of the properties remain the same, in accordance with the same theory followed by us in the *Belridge* and *Whitwell* cases.

It is our opinion that the Federal tax effects of unitization should not be made to depend upon the geographical location of the unitized properties but, as pointed out by the U.S. Supreme Court, the tax laws should be interpreted so as to give a uniform application to a nationwide scheme of taxation. See *Burnet* v. *Harmel*, 287 U.S. 103; *Lyeth* v. *Hoey*, 305 U.S. 188; and *United States* v. *Pelzer*, 312 U.S. 399. In the *Harmel* case the Supreme Court, among other things, said:

Here we are concerned only with the meaning and application of a statute enacted by Congress * * *. The exertion of that power is not subject to state control. It is the will of Congress which controls, and the expression of its will in legislation, in the absence of language evidencing a different purpose, is to be interpreted so as to give a uniform application to a nation-wide scheme of taxation. * * * State law may control only when the operation of the federal taxing act, by express language or necessary implication, makes its own operation dependent upon state law. * * *

It may be noted in passing that the *Harmel* case involved Texas properties as does the instant case. In the *Harmel* case the question was whether proceeds from an oil and gas lease were to be taxed as capital gains from the sale of capital assets or as ordinary rental income. Under Texas law, unlike the law in other States, Texas regarded an oil and gas lease as a present sale of the oil and gas in place. In holding this was not controlling, the Supreme Court also said:

We examine the Texas law only for the purpose of ascertaining whether the leases conform to the standard which the taxing statute prescribes for giving the favored treatment to capital gains. Thus tested, we find in the Texas leases no differences from those leases where the title to the oil and gas passes only on severance by the lessee, which are of sufficient consequence to call for any different application of section 208. The fact that title to the oil and gas is said to pass before severance, rather than after, is not such a difference. The economic consequences to the lessor of the two types of lease are the same. * * *

The uniform application of Federal taxation in this matter has been adopted by us in the *Belridge* and *Whitwell* cases and we think should also be applied here.

We hold, therefore, that notwithstanding the unitization and operating agreements involved herein, Killam & Hurd continued to own three separate properties for depletion purposes. We sustain the petitioners' contention. *Belridge Oil Co., supra; Earl V. Whitwell, supra.*

All of the remaining issues will be disposed of under Rule 50 in accordance with the stipulation previously mentioned. In view of the stipulation, which is incorporated herein, it is not deemed necessary to set forth in this opinion the facts agreed upon as to the remaining issues.

*Decisions will be entered under Rule 50.*